# DISTRICT OF COLUMBIA
# OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION
Office of Dispute Resolution
810 First Street, N.E., 2nd Floor
Washington, D.C.  20002

| | | |
|---|---|---|
| *Student*,[1] | ) | Case No.:  2017-0186 |
| through *Parent*, | ) | |
| *Petitioner*, | ) | Date Issued:  9/24/17 |
| | ) | |
| v. | ) | Hearing Officer:  Keith L. Seat, Esq. |
| | ) | |
| District of Columbia Public Schools | ) | Hearing Dates:  9/12/17 & 9/13/17 |
| ("DCPS"), | ) | Hearing Room:  2006 |
| Respondent. | ) | |
| | ) | |

# HEARING OFFICER DETERMINATION

### Background

Petitioner, Student's Parent, pursued a due process complaint alleging that Student had been denied a free appropriate public education ("FAPE") in violation of the Individuals with Disabilities Education Improvement Act ("IDEA") because Student had not been provided a sufficient Individualized Education Program ("IEP") and placement with full-time 1:1 Applied Behavior Analysis ("ABA") therapy, and that Parent was not provided sufficient information and input.  DCPS responded that the IEP and placement were appropriate, and that Parent was fully involved.

### Subject Matter Jurisdiction

Subject matter jurisdiction is conferred pursuant to the IDEA, 20 U.S.C. § 1400, *et seq.*; the implementing regulations for IDEA, 34 C.F.R. Part 300; and Title V, Chapter E-30, of the District of Columbia Municipal Regulations ("D.C.M.R.").

### Procedural History

Following the filing of the due process complaint on 7/5/17, the case was assigned to the undersigned on 7/7/17.  DCPS filed a response on 7/14/17 and did not challenge jurisdiction.  The resolution session meeting took place on 7/13/17, but the parties neither

---

[1] Personally identifiable information is provided in Appendix A, including terms initially set forth in italics.

**Hearing Officer Determination**
Case No. 2017-0186

settled the case nor terminated the 30-day resolution period, which ended on 8/4/17.  A final decision in this matter must be reached no later than 45 days following the end of the resolution period, as extended by a 10-day continuance, which requires a Hearing Officer Determination ("HOD") by 9/28/17.

The due process hearing took place on 9/12/17 and 9/13/17, and was closed to the public.  Petitioner was represented by *Petitioner's counsel*.  DCPS was represented by *Respondent's counsel*.  Petitioner was present throughout most of the hearing.

Petitioner's Disclosures, submitted on 9/5/17 (with a corrected disclosure letter on 9/14/17), contained documents P1 through P46, which were admitted into evidence over numerous objections.  Petitioner also filed a supplemental disclosure letter along with complete versions of P11 and P26 on 9/14/17 as requested by the undersigned.  Respondent's Disclosures, submitted on 9/5/17, contained documents R1 through R35, of which Respondent's counsel offered only R1-R12, R14-R16, R21-R28, R32 and R34, all of which were admitted into evidence over an objection to R1; all objections by Petitioner to school employees being called as experts were overruled.

Petitioner's counsel presented 3 witnesses in Petitioner's case-in-chief (*see* Appendix A):

1. Parent

2. *Health Advocate*

3. *Private Behavior Analyst* (qualified without objection as an expert in Assessing, Treating, and Developing Behavior Plans for Children with Autism, and Applied Behavior Analysis)

Respondent's counsel presented 3 witnesses in Respondent's case (*see* Appendix A):

1. *Special Education Teacher* at *Public Charter School*

2. *School Behavior Analyst* (qualified without objection as an expert in Applied Behavior Analysis and Programming for Special Education Students)

3. *Principal* at Public Charter School (qualified over objection as an expert in Special Education and IEP Programming for Students with Autism)

Petitioner's counsel recalled Parent as the only rebuttal witness.

The issues to be determined in this Hearing Officer Determination are:

**Issue 1:** Whether DCPS denied Student a FAPE by providing an IEP for 2016/17[2] with insufficient and inappropriate services, where the IEP (a) does not match Student's

---

[2] All dates in the format "2016/17" refer to school years.

needs as identified in an independent evaluation (i.e., 30 hours/week of ABA therapy in a one-on-one setting with services administered by behavior therapists who are under the direct supervision of a Board Certified Behavior Analyst ("BCBA")), and/or (b) fails to identify Student's needs with sufficient specificity, including a classroom specially designed for children with disabilities like Student's. *Respondent has the burden of persuasion on this issue, if Petitioner establishes a prima facie case.*

**Issue 2:** Whether DCPS denied Student a FAPE by failing to offer an appropriate educational placement for 2016/17, where the placement did not include the services, supports, staffing, and peer interaction required, including a comprehensive treatment model of 30 hours/week of ABA therapy in a one-on-one setting with services administered by behavior therapists who are under the direct supervision of a BCBA, and a classroom for students similar to Student on the autism spectrum. *Respondent has the burden of persuasion on this issue, if Petitioner establishes a prima facie case.*

**Issue 3:** Whether DCPS denied Student a FAPE by failing to implement Student's IEP with fidelity due to (a) Student's one-on-one full-time aide being "out of area," and (b) failure to manage Student's behavior. *Petitioner has the burden of persuasion on this issue.*

**Issue 4:** Whether DCPS denied Student a FAPE by (a) not allowing Parent input in IEP development, (b) not involving Parent in the placement decision, and/or (c) referring Parent to social services after she sent notifications beginning in or about November 2016 of her unilateral placement of Student at *Nonpublic Institution*.[3] *Petitioner has the burden of persuasion on this issue.*

**Issue 5:** Whether DCPS denied Student a FAPE by not providing information and refusing to answer questions about Student's programming at Public Charter School, and preventing Parent's educational advocate from observing the proposed program. *Petitioner has the burden of persuasion on this issue.*

Petitioner seeks the following relief:

1.  A finding that Student was denied a FAPE.

2.  Within 10 business days after receiving appropriate documentation, DCPS shall reimburse Parent for her costs of educating Student at Nonpublic Institution since November 2016, including tuition (unless otherwise covered by Medicaid), transportation, provision of the special diet required by Student's IEP, and any other reasonable associated costs.

---

[3] Issue 4 combines portions of the first two issues, along with the fifth issue, from pp. 6-7 of the due process complaint. At the prehearing conference, Petitioner's counsel expressly withdrew (without prejudice) the fourth issue, listed on p. 7 of the complaint, which was changing Student's placement without Parent's involvement or an IEP meeting.

Hearing Officer Determination
Case No. 2017-0186

> 3. DCPS shall place and fund (unless otherwise covered by Medicaid) Student
>    at Nonpublic Institution or another appropriate placement for 2017/18 and
>    issue a confirming prior written notice.
>
> 4. Within 15 business days, DCPS shall revise Student's IEP to include a
>    minimum of 30 hours/week of direct ABA therapy in a one-on-one setting
>    with services administered by behavior therapists who are under the direct
>    supervision of a BCBA.

At the conclusion of Petitioner's case-in-chief, Respondent's counsel moved for a directed verdict, which, after brief oral argument, was denied by this Hearing Officer based on Petitioner having met her burden of establishing a prima facie case on Issues 1 and 2 based on recommendations for ABA that were not adopted from the independent evaluation, plus the numerous documents admitted in the record that the undersigned had not yet reviewed in light of the testimony in the case as to all issues.

## **Findings of Fact**

After considering all the evidence, as well as the arguments of both counsel, the Findings of Fact[4] are as follows:

1. Student is a resident of the District of Columbia; Petitioner is Student's Parent.[5] Student is *Age, Gender* and attending Nonpublic Institution, where Student began receiving services in October 2016.[6]  Student previously attended Public Charter School from 2006/07 to early 2016/17.[7]

2. Student is eligible for special education and related services as a child with Autism Spectrum Disorder.[8]  Student is nonverbal and has significant needs.[9]  Student's 12/15/15 IEP and 12/6/16 IEP both provide for 27.5 hours/ week of specialized instruction, 1 hour/week of occupational therapy ("OT"), 1.5 hours/week of speech-language pathology,

---

[4] Footnotes in these Findings of Fact refer to the sworn testimony of the witness indicated or to an exhibit admitted into evidence.  To the extent that the Hearing Officer has declined to base a finding of fact on a witness's testimony that goes to the heart of the issue(s) under consideration, or has chosen to base a finding of fact on the testimony of one witness when another witness gave contradictory testimony on the same issue, the Hearing Officer has taken such action based on the Hearing Officer's determinations of the credibility and/or lack of credibility of the witness(es) involved.

[5] Parent.

[6] *Id.*

[7] *Id.*

[8] P11-1; P26-1.

[9] Parent; P23-3; P32.

and a dedicated aide 30 hours/week.[10]  In addition, the 12/6/16 IEP provided 2 hours/month of behavioral support services.[11]

3.  Student's 12/6/16 IEP reported that at Public Charter School Student continued to strengthen functional numeracy skills and to make "great strides" in functional literacy skills.[12]  Student mastered the goal of being able to request the restroom when needed.[13]  Student was to continue working on decreasing behaviors of concern using a token board.[14]  Student was showing success, so the tokens needed to earn desired objects (i.e., puzzles, ball, veggie chips and computer access) were increased from 5 to 10 tokens.[15]  During PE, Student sometimes played catch with a large ball with peers for up to 40 minutes.[16]  Student made steady progress toward OT goals.[17]

4.  Student made progress during 2015/16, almost mastering most goals.[18]  Public Charter School's Progress Report for calendar year 2016 showed progress by Student, with mastery of some objectives.[19]  As discussed in more detail below, by October 2016, Student had made a "lot of progress" with more "air hits" (without contact) in place of actual hitting.[20]

5.  Public Charter School worked on functional literacy, functional mathematics and daily living skills with Student in 2016 and made progress on Student's academic goals.[21]  Student's IEP team agreed on 12/6/16 that the current placement at Public Charter School was appropriate.[22]

6.  ABA Therapy.  An independent evaluation (a Functional Behavioral Assessment or FBA) dated 4/19/16 was conducted by Nonpublic Institution which recommended that Student receive 30 hours/week of ABA therapy by behavior therapists in a 1:1 setting under the direct supervision of a BCBA, along with another 4 hours/week of supervision for direct assessment, program modification and stakeholder training; at least 15 hours/week was to be at Nonpublic Institution, with another 15 hours/week at school, services which Nonpublic

---

[10] P11-4; P26-4.
[11] P26-4.
[12] P26-2A,2B.
[13] P26-2C.
[14] P26-2G; P20-5; Special Education Teacher.
[15] P26-2G; P20-5.
[16] *Id.*
[17] P26-3; P20-2.
[18] Special Education Teacher.
[19] R14; R15-1,2,3,6,9.
[20] Special Education Teacher.
[21] P20-4,5,6; Special Education Teacher.
[22] P20-6.

**Hearing Officer Determination**
Case No. 2017-0186

Institution offered to provide at Public Charter School.[23]  School Behavior Analyst testified that Nonpublic Institution has an "excellent reputation."[24]

7.   The independent FBA did not specify what should be done with the recommended 30 hours/week of direct 1:1 ABA therapy; the usual process is to determine what should be done and then ascertain the hours needed to accomplish it.[25]  School Behavior Analyst asked the Nonpublic Institution evaluator at the FBA review meeting what was to be done during the recommended 30 hours/week and received no response.[26]  In School Behavior Analyst's expert opinion, recommendations of service levels, such as 30 hours/week of 1:1 ABA therapy, are beyond the scope of an FBA and there was nothing in the FBA to substantiate the 30 hours/week recommendation.[27]

8.   There are many different aspects to "ABA therapy"; Parent (and her advocates) and Public Charter School staff had difficulty determining what the other meant by the phrase.[28]  ABA is one instructional approach used at Public Charter School and one of the methodologies incorporated in implementing Student's IEPs; Public Charter School uses others, including TEACCH, which has a lot of overlap with ABA.[29]  Public Charter School believes that its more comprehensive approach to teaching methods is preferable to just relying on ABA alone.[30]

9.   Student does not require full-time 1:1 ABA therapy to make academic gains.[31]  Principal stated at the 12/6/16 IEP meeting that Public Charter School believed that Student did not need 15 hours/week of 1:1 ABA therapy.[32]  School Behavior Analyst understood that Parent was seeking full-time ABA discrete trial training, which School Behavior Analyst did not believe was appropriate, as it would be more restrictive and not very motivating for Student.[33]  Public Charter School was trying to teach Student skills for real life and viewed ABA work in the "natural environment" (school, home, community) to be more beneficial by permitting generalization of skills learned.[34]  Public Charter School has

---

[23] P13-1,22; Principal.  Public Charter School had previously conducted an FBA and developed a BIP that School Behavior Analyst had revised 8 times.  School Behavior Analyst; P12-1 (1/29/16).  The final 12/13/16 FBA/BIP had not changed since 6/27/16. School Behavior Analyst; P21; R11; R10-7 *et seq.*
[24] School Behavior Analyst.
[25] School Behavior Analyst; P13.
[26] R1-6; School Behavior Analyst.
[27] School Behavior Analyst; P13.
[28] R1-5 ("depends on what you mean by ABA therapy"); Special Education Teacher (implemented different components of ABA at Public Charter School, including errorless teaching, positive reinforcement, shaping, fading, and others).
[29] R1-5; School Behavior Analyst.
[30] Principal.
[31] School Behavior Analyst; Special Education Teacher.
[32] P20-7.
[33] School Behavior Analyst.
[34] School Behavior Analyst; Special Education Teacher.

the staff to implement ABA services as needed; "everyone" at Public Charter School has had training in ABA.[35]  ABA principles are incorporated into Public Charter School's instructional strategies and throughout Public Charter School.[36]  Public Charter School does provide 1:1 ABA therapy for some students for a limited time.[37]

10. Public Charter School does not include ABA or other instructional methodologies on any student's IEP, in order to avoid rigidity and permit flexible IEP implementation by those working with and most knowledgeable about the students.[38]  While full-time 1:1 ABA therapy is needed in some situations, Student was making progress at Public Charter School without it.[39]  Student's IEP team determined that no IEP change was needed.[40]  Full-time 1:1 ABA therapy would not leave time for so-called Specials and would not give Student time in a group setting, but would isolate Student in a separate location.[41]  Public Charter School offered Student an Art Program, Horticulture, Musical Therapy/Education, and Physical Education.[42]  Nonpublic Institution was not implementing Student's IEP; Public Charter School provided IEP implementation "all day, every day."[43]

11. At Public Charter School, Student was not segregated but in the cafeteria with Student's dedicated aide and 5-6 children at each table.[44]  Student was never in a group setting at Nonpublic Institution, and had interaction with peers for 5-10 minutes twice a day.[45]  Nonpublic Institution was not working on academics much with Student, but mostly focusing on Student's core autism deficits, specifically behavior and language skills.[46]

12. The independent evaluation was reviewed at Public Charter School on 6/6/16; Public Charter School offered to provide some amount of direct 1:1 ABA therapy for Student with a registered behavior tech overseen by a BCBA, but Parent did not agree; Public Charter School renewed its offer on 1/12/17 in an effort to have Student return to Public Charter School.[47]  Parent refused because Public Charter School could not guarantee consistent staffing or room and couldn't answer questions about the credentials of those who would be providing services.[48]

---

[35] School Behavior Analyst.
[36] *Id.*
[37] *Id.*
[38] School Behavior Analyst; Principal.
[39] School Behavior Analyst.
[40] Principal.
[41] *Id.*
[42] R16-11,12,13,14.
[43] Private Behavior Analyst; Special Education Teacher.
[44] Special Education Teacher.
[45] Private Behavior Analyst.
[46] *Id.*
[47] R24-2; Principal.
[48] Parent.

**Hearing Officer Determination**
Case No. 2017-0186

13. On 1/10/17, Parent requested a "Change in Placement meeting."[49]   On 1/31/17 an Multi-Disciplinary Team ("MDT") meeting at Public Charter School reviewed Student's placement and agreed to move forward with an Least Restrictive Environment ("LRE") review; Principal asked Parent if Student would attend Public Charter School so the LRE team could observe Student in an education setting; Parent made no promises.[50]   On 3/27/17, Parent stated that Public Charter School is not an appropriate placement for Student because it does not provide direct ABA therapy.[51]   An MDT meeting was held on 6/26/17 to answer Parent's questions about the Public Charter School program for Student.[52]   Staff stated that Public Charter School must follow IDEA, DCMR and DC best practices, but was willing to make changes to Student's IEP to accommodate Parent and was open to discussion.[53]

14. <u>Shift to Nonpublic Institution</u>.   On 10/24/16, Student began receiving services at Nonpublic Institution, although Parent did not inform Public Charter School; staff did not know where Student was.[54]   A physician's verification form completed on 8/11/16 in the name of a physician (and signed by a Certified Pediatric Nurse Practitioner) stated that Student would be receiving ABA therapy at Nonpublic Institution to provide intensive work on behavioral management and 1:1 ABA.[55]   On 8/31/16 a letter signed by the Certified Pediatric Nurse Practitioner recommended that Student "be evaluated and treated at [Nonpublic Institution] for (sic) intensive ABA therapy" which was "medically-necessary" to address behavioral concerns for the safety of both child and family, but made no mention of educational needs.[56]   Public Charter School did not receive the 8/31/16 medical-necessity letter.[57]

15. Nonpublic Institution recommended in its Progress Reports that Student receive 35 hours/week of 1:1 therapy and some 5 hours/week of supervision, which was approved by a non-educational DC agency.[58]   Nonpublic Institution considered Student a candidate for school "at some point," but indicated that Student would not be ready to leave its program until (a) aggression, aggression attempts, elopement and vocal protesting had not occurred for at least 6 months and no other inappropriate behaviors emerged during that time, or (b) Student acquired at least 75% of the necessary functional skills for Student's age; Student's

---

[49] R24-13; P27-3.

[50] P30-2.

[51] P38-1.

[52] P41-1.

[53] P41-3.

[54] P29-1; Principal; School Behavior Analyst; Special Education Teacher.

[55] P23-3,4.

[56] P18.

[57] Principal.

[58] P29-37 (1/19/17); P42-51 (7/10/17: 35 hours of 1:1 therapy and supervision); Private Behavior Analyst.

**Hearing Officer Determination**
Case No. 2017-0186

current level was 16.6%, which had not increased in nearly 6 months at Nonpublic Institution, according to Progress Reports.[59]

16. <u>Attendance Issues</u>.  Parent not telling Public Charter School that Student was going to Nonpublic Institution resulted in increasingly serious steps as Public Charter School exercised due diligence to ensure that Student was safe.[60]  Public Charter School's initial step is to call every day to check on every absent child.[61]  Parent variously told Public Charter School on the daily phone calls that Student was sick, that the bus hadn't arrived, or that Student went to therapy at Nonpublic Institution; Parent often did not answer Public Charter School's daily calls and never answered the calls after 1/18/17.[62]  Other calls were made to Parent by Special Education Teacher, along with several emails from Special Education Teacher, social worker and vice principal.[63]

17. On 11/4/16, social worker and an administrator attempted a home visit but were not able to make contact with the family; they contacted the police who conducted a wellness check.[64]  Social worker left a letter for Parent on 11/4/16 stating that she had attempted a home visit, hadn't heard anything since 10/27/16, and asked for some response by phone or email.[65]  Public Charter School made an educational neglect referral to Child and Family Services Agency ("CFSA") on 11/16/16.[66]  Public Charter School made a second CFSA referral on 2/7/17.[67]

18. On 11/22/16 Parent communicated to Public Charter School that Student was attending Nonpublic Institution for behavior support.[68]  Public Charter School informed Parent that Nonpublic Institution was not a school, so to be excused a physician's note was required stating that the services at Nonpublic Institution were medically necessary.[69]  Nonpublic Institution's documents indicated that Student was not attending Nonpublic Institution in lieu of school and Nonpublic Institution appeared not to be a 5-day/week program.[70]  On 1/11/17, Public Charter School again asked for medical documentation that Student's ABA services were medically necessary.[71]  Nonpublic Institution asserted in

---

[59] Private Behavior Analyst; P29-37; P42-50.
[60] Principal.
[61] *Id.*
[62] P33-1,2,3.
[63] P31-2.
[64] P20-2; P27-2; P31-2.
[65] R23.
[66] P27-2; P31-2; R23-2.
[67] R23-2.
[68] P27-3; P31-2 (Parent reported Student is attending Nonpublic Institution a few days a week, but "not attending school" there).
[69] P27-3; Principal; R34-29 (documentation for "medically needed appointments must be submitted by a medical provider").
[70] P27-3; Private Behavior Analyst (Student began 4 days a week due to lack of Nonpublic Institution staff, but increased to 5 days a week once staffing was available).
[71] R24-3.

**Hearing Officer Determination**
Case No. 2017-0186

treatment verification letters that Student was receiving "pre-approved medically necessary ABA services" from Nonpublic Institution.[72]

    19. Social worker provided Parent a link to DCPS's attendance policy along with an explanation of Public Charter School's policies on 11/23/16.[73]  A copy of the Public Charter School's school handbook was provided to Parent annually and specifically emailed on 11/23/16, 11/28/16 and 11/29/16.[74]  On 12/6/16, Public Charter School's attendance policy in its school handbook was reviewed with Parent; social worker explained that documentation for Student being at Nonpublic Institution needed to come from the attending physician.[75]

    20. On 11/29/16, social worker noted that if the absences were not excused, Public Charter School would need to make a truancy court referral in the near future.[76]  On 1/5/17, social worker emailed Parent that a truancy court referral should be made at 15 unexcused absences, and Student had 31 unexcused absences, so if she did not receive a physician's note by 1/6/17, the truancy court referral would be submitted.[77]  Public Charter School made a court truancy referral on 1/6/17 due to Student being truant for 32 days in 2016/17.[78]

    21. A truancy notification early in February 2017 stated that Student had accumulated 53 unexcused absences and was "chronically truant"; Public Charter School was required by law to refer Student to CFSA.[79]  Public Charter School submitted an educational neglect form regarding Student on 2/7/17.[80]  CFSA completed an investigation report on 2/8/17, noting concern from not having physically seen Student; Student was not attending school.[81]

    22. A 3/13/17 email from Petitioner's counsel's firm to Public Charter School stated that Parent "temporarily" removed Student to obtain behavioral services needed at Nonpublic Institution.[82]  Petitioner's counsel's formal unilateral placement notice on 5/26/17 stated that Parent "intends" to remove Student from DCPS and unilaterally place Student at Nonpublic Institution.[83]  On 6/9/17, DCPS acknowledged receipt of the unilateral placement letter, but did not agree to bear the cost.[84]  On 6/26/17 and other times, Parent would not answer a question from Public Charter School about where Student was, referring questions to

---

[72] R24-30,5,6,7,8,9.10.
[73] R24-35; Principal (Public Charter School must follow DCPS policies).
[74] R26-10; P27-3; R24-20,44; R24-15 (handbook attached and attendance section pasted in email); P45 (truancy timeline); Principal.
[75] P20-1.
[76] R24-19.
[77] R24-14.
[78] P27-1; R23-2.
[79] R22.
[80] P31-2.
[81] *Id.*
[82] P36-2.
[83] P39-1.
[84] P40.

counsel (who was not present).[85]  Student is still enrolled at Public Charter School; Parent has verified residency for Student at Public Charter School for 2017/18.[86]

23.  <u>Behavior</u>.  Student's behaviors of concern were primarily physical aggression (hitting staff and peers), loud vocalizations/crying and elopement.[87]  Apart from hitting/attempted hitting, almost all of Student's other recorded behaviors had reportedly dropped to zero or very close to zero from October 2015 through October 2016.[88]  As background, in 2011, Student was hitting others 23.5 times/week.[89]  In January 2012, Student hit 29 times during the month; in June 2012, 61 times during the month; in October 2012, hitting increased to 42 times per day.[90]

24.  Student's hitting was below 5/day from January 2013 through July 2014; above 10/day from September 2014 through June 2015; spiked from August 2015 to November 2015; below 10/day from December 2015 through April 2016; and down to no more than 2/day from July 2016 through October 2016.[91]

25.  The independent evaluation found that behavioral issues were much greater at Public Charter School than at Nonpublic Institution, with 6 incidents/hour of aggression at Public Charter School compared with less than 1/hour at Nonpublic Institution with Parent present.[92]  School Behavior Analyst testified that the Nonpublic Institution conclusions were invalid because they lacked context and it was not clear what was going on; further, the Nonpublic Institution observer engaged Student's dedicated aide in conversation during the observation, leading to much higher figures for Student when not receiving the usual level of support.[93]  Nonpublic Institution's Private Behavior Analyst testified that the IEE observations at Public Charter School were short and that multiple observations at Public Charter School would have been desirable, when the IEE was based on only one.[94]  The Nonpublic Institution evaluator relied on a questionnaire about Student's behavior, which School Behavior Analyst testified was not valid or reliable.[95]  The Nonpublic Institution

---

[85] P41-3; Principal.

[86] Principal.

[87] P5-2.  Putting objects in Student's ears, nose and mouth was an earlier concern that was resolved.  P2; P19.

[88] P19 (while the document indicates that hitting is combined with attempts, School Behavior Analyst's testimony and the underlying data at P22 clarified that P19 does not show attempts).

[89] P1.

[90] P2.

[91]  P19.  In August 2015, Student had an average of 45 instances of aggression a day, due to a change in classrooms; in October 2015, the average was 26/day.  P11-3; P10-2; P15-3 (August 2015 moved to new classroom with new teacher); P19 (no September 2015 data).

[92] P13-4,10,11,19,20,21; *cf.* P19 (showing 6 incidents/day at Public Charter School in March 2016).

[93] School Behavior Analyst; Special Education Teacher.

[94] Private Behavior Analyst.

[95] School Behavior Analyst.

evaluator should have interviewed those who knew Student best, but did not seek out or interview School Behavior Analyst for the FBA.[96]

26. By the time Student left Public Charter School in October 2016, data showed a decline in rates of problematic behaviors and an increase in participation in activities.[97]  On 3/27/17, School Behavior Analyst provided data and an explanation of the decrease in behaviors of concern at Public Charter School.[98]  Health Advocate has known Student most of Student's life and has seen progress in behavior over time, with hitting decreasing significantly and the ability to sit still increasing.[99]

27. The data indicated that Student was making more progress on targeted behavior at Public Charter School than Nonpublic Institution.[100]  At Nonpublic Institution, there was an increase in aggression from January to July 2017.[101]  The Nonpublic Institution goal for aggression was less than 2 incidents/hour (in 8 of 10 sessions), which was not achieved.[102]  Student's aggression level in the last months at Public Charter School were about 2/day, lower than its goal of 5/day.[103]  The parties noted that imposing higher demands on Student could trigger more undesirable behaviors due to heavier workloads:  Nonpublic Institution's 7/10/17 Progress Report stated that every time Student requested a break, one was to be granted immediately.[104]  At Public Charter School, there was no "down-time" for Student, as Student was always doing things or getting ready to transition.[105]

28. <u>Disabilities of Classmates</u>.  Public Charter School takes disability into account in assigning classrooms, based on a philosophy of not having uniform classes with only a single disability, but instead keeping skill levels together.[106]  Mixing disabilities and avoiding all-autism classes is beneficial for peer modeling, as students with certain strengths can help others with different strengths.[107]  Cognitively, Student is within the range of

---

[96] School Behavior Analyst (School Behavior Analyst had observed Student many times totaling more than 50 hours, as well as working 1:1 with Student and analyzing needs).
[97] P32.
[98] P38-1.
[99] Health Advocate.
[100] School Behavior Analyst (while there was some question about the precision of the Public Charter School data, the trend information was most important).  Public Charter School and Nonpublic Institution initially used differing definitions of how often a hit by Student would be counted, but Public Charter School modified its definition to match Nonpublic Institution.  Private Behavior Analyst; School Behavior Analyst.
[101] P42-8.  Nonpublic Institution also had an increase in aggression attempts from January to July 2017.  P42-15.
[102] P42-8.
[103] School Behavior Analyst.
[104] P42-7.
[105] Special Education Teacher.
[106] Principal.
[107] *Id.*

**Hearing Officer Determination**
Case No. 2017-0186

Student's Public Charter School class: higher than some and lower than others.[108]
Student's class at Public Charter School had several children with autism, others with
Intellectual Disability ("ID"), and some who are classified as having Multiple Disabilities
("MD") with both autism and ID.[109] The children in class who were not autistic provided
modeling for Student in the areas of appropriate play in Physical Education ("PE") and how
to walk in the building, among other things.[110]

    29. <u>Parental Input.</u> Parent has had many opportunities to provide input to the MDT/IEP
team, which always gave serious consideration to her suggestions and concerns.[111] Parent
participated in numerous MDT/IEP meetings and has been a "great advocate" for Student.[112]
Principal always asks for parental input on IEPs and views Parent as the expert on
Student.[113] Parent had a lengthy MDT meeting on 6/26/14 focusing on Student's food/diet
and communication, among other issues.[114] Public Charter School put significant supports
in place to accommodate Student's special diet as requested by Parent, purchasing special
foods and a special freezer to store Student's specific meals based on individualized menus
generated by Student's classroom teacher.[115] At the 6/26/14 MDT meeting, Public Charter
School inquired about Parent's concerns with placement, but Parent declined to discuss
placement.[116]

    30. Public Charter School reduced Student's access to an iPad upon request by Parent,
even though that was difficult for Student and caused a desire to hit others who were using
technology in the classroom.[117] Adding and repeating a goal on Student's IEPs about using
the restroom at school was done because it was important to Parent.[118]

    31. Recognizing that Parent was not satisfied with Public Charter School, another
location was offered to Parent to see if that school and staff might work out better; Parent
declined to take a tour or consider the alternative location, stating that it wouldn't be helpful
if Student's IEP remained the same.[119]

    32. <u>Other Issues.</u> A dedicated aide was with Student all day long at Public Charter
School; Special Education Teacher didn't recall ever seeing Student without the dedicated

---

[108] Special Education Teacher.
[109] *Id.*
[110] *Id.*
[111] Principal; R2; R3; R4; R5; R6; R7; R8.
[112] Principal.
[113] *Id.*
[114] P3.
[115] P5-3.
[116] P3-4.
[117] P10-2.
[118] Special Education Teacher.
[119] Parent; P38-2,3 (3/27/17 MDT meeting); R24-17,16 (on 11/29/16 offered to discuss next
steps if Parent does not want Student at Public Charter School).

aide.[120]  Documentary reference to Student's dedicated aide being "out of the area" did not mean out of arm's reach unless another staffer was covering Student.[121]  Student's dedicated aide was out of area when preparing Student's lunch or taking a break, during which time other coverage was provided.[122]

33. An educational advocate for Parent sent a 3/13/17 email to Public Charter School attaching a document labeled "Observation Form.pdf."[123]

## Conclusions of Law

Based on the Findings of Fact above, the arguments of counsel, as well as this Hearing Officer's own legal research, the Conclusions of Law are as follows:

The overall purpose of the IDEA is to ensure that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  *See Boose v. Dist. of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015) (the IDEA "aims to ensure that every child has a meaningful opportunity to benefit from public education").

"The IEP is 'the centerpiece of the statute's education delivery system for disabled children.'"  *Endrew F. ex rel. Joseph F. v. Douglas County Sch. Dist. RE-1*, 137 S. Ct. 988, 994, 197 L. Ed. 2d 335 (2017), *quoting Honig v. Doe*, 484 U.S. 305, 311, 108 S. Ct. 592, 98 L.Ed.2d 686 (1988).  "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child."  *Endrew F.*, 137 S. Ct. at 994, *quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982).

Once a child who may need special education services is identified and found eligible, DCPS must devise an IEP, mapping out specific educational goals and requirements in light of the child's disabilities and matching the child with a school capable of fulfilling those needs.  *See* 20 U.S.C. §§ 1412(a)(4), 1414(d), 1401(a)(14); *Endrew F.*, 137 S. Ct. at 994; *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369, 105 S. Ct. 1996, 2002, 85 L. Ed. 2d 385 (1985); *Jenkins v. Squillacote*, 935 F.2d 303, 304 (D.C. Cir. 1991); *Dist. of Columbia v. Doe*, 611 F.3d 888, 892 n.5 (D.C. Cir. 2010).

The IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F.*, 137 S. Ct. at 1001.  The Act's FAPE requirement is satisfied "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."  *Smith v. Dist. of*

---

[120] Special Education Teacher.
[121] Special Education Teacher; P9-4,6; P21-4; P15-2.
[122] Special Education Teacher.
[123] P36-2.

**Hearing Officer Determination**
Case No. 2017-0186

*Columbia*, 846 F. Supp. 2d 197, 202 (D.D.C. 2012), *citing Rowley*, 458 U.S. at 203. The IDEA imposes no additional requirement that the services so provided be sufficient to maximize each child's potential. *Rowley*, 458 U.S. at 198. In its recent decision, the Supreme Court made very clear that the standard is well above *de minimis*, however, stating that "[w]hen all is said and done, a student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all." *Endrew F.*, 137 S. Ct. at 1001.

In addition, Respondent must ensure that to the maximum extent appropriate, children with disabilities are educated with children who are nondisabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. 34 C.F.R. 300.114; *Endrew F.*, 137 S. Ct. at 1000 (children with disabilities should receive education in the regular classroom to the extent possible).

A Hearing Officer's determination of whether a child received a FAPE must be based on substantive grounds. In matters alleging a procedural violation, a Hearing Officer may find that a child did not receive a FAPE only if the procedural inadequacies (i) impeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of educational benefit. 34 C.F.R. 300.513(a). In other words, an IDEA claim is viable only if those procedural violations affected the child's *substantive* rights. *Brown v. Dist. of Columbia*, 179 F. Supp. 3d 15, 25-26 (D.D.C. 2016), *quoting N.S. ex rel. Stein v. Dist. of Columbia*, 709 F. Supp. 2d 57, 67 (D.D.C. 2010).

Petitioner carries the burden of production and persuasion, except on issues of the appropriateness of an IEP or placement on which Respondent has the burden of persuasion, if Petitioner establishes a prima facie case. D.C. Code Ann. § 38-2571.03(6); *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62, 126 S. Ct. 528, 537, 163 L. Ed. 2d 387 (2005). "Based solely upon evidence presented at the hearing, an impartial hearing officer shall determine whether . . . sufficient evidence [was presented] to meet the burden of proof that the action and/or inaction or proposed placement is inadequate or adequate to provide the student with a FAPE." 5-E D.C.M.R. § 3030.3.

**Issue 1:** *Whether DCPS denied Student a FAPE by providing an IEP for 2016/17 with insufficient and inappropriate services, where the IEP (a) does not match Student's needs as identified in an independent evaluation (i.e., 30 hours/week of ABA therapy in a one-on-one setting with services administered by behavior therapists who are under the direct supervision of a BCBA), and/or (b) fails to identify Student's needs with sufficient specificity, including a classroom specially designed for children with disabilities like Student's. (Respondent has the burden of persuasion on this issue, if Petitioner establishes a prima facie case.)*

**Issue 2:** *Whether DCPS denied Student a FAPE by failing to offer an appropriate educational placement for 2016/17, where the placement did not include the services, supports, staffing, and peer interaction required, including a comprehensive treatment*

**Hearing Officer Determination**
Case No. 2017-0186

*model of 30 hours/week of ABA therapy in a one-on-one setting with services administered by behavior therapists who are under the direct supervision of a BCBA, and a classroom for students similar to Student on the autism spectrum.  (Respondent has the burden of persuasion on this issue, if Petitioner establishes a prima facie case.)*

Petitioner established a prima facie case on the combined issues of an appropriate IEP and placement for 2016/17 based on the independent evaluation and testimony, shifting the burden of persuasion to Respondent.  Respondent in turn met its burden of demonstrating that it did provide an appropriate IEP and educational placement for Student, as it convincingly explained why it did not follow the ABA recommendations in the independent evaluation and does not segregate autism students in classrooms by disability.

The applicable legal standard for analyzing the appropriateness of an IEP has recently been articulated by Chief Justice Roberts for a unanimous Supreme Court as whether it is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  *Endrew F.*, 137 S. Ct. at 1001.  The undersigned views this new standard as building on and buttressing prior articulations of whether the challenged IEP was "reasonably calculated to produce meaningful educational benefit" and to permit Student to access the educational curriculum to the extent possible.  *See Damarcus S. v. Dist. of Columbia*, 190 F. Supp. 3d 35, 51 (D.D.C. 2016); *A.M. v. Dist. of Columbia*, 933 F. Supp. 2d 193, 204 (D.D.C. 2013), *quoting Rowley,* 458 U.S. at 206-07.

The measure and adequacy of the IEP are to be determined as of the time it was provided to Student.  *See, e.g., S.S. ex rel. Shank v. Howard Rd. Acad.*, 585 F. Supp. 2d 56, 66 (D.D.C. 2008).  The appropriateness of Student's IEP is analyzed by specifically considering the specific concerns raised by Petitioner, which were the lack of 30 hours/week of direct 1:1 ABA therapy for Student and not having Student in a classroom solely for autistic students.  *See* 34 C.F.R. 300.320(a)(4),(5); *Honig*, 484 U.S. at 311.

Here, the central question is whether Student's IEP team at Public Charter School improperly refused to adopt the independent evaluation's recommendation of 30 hours/week of direct 1:1 ABA therapy for Student.  The undersigned concludes that Respondent demonstrated the reasonableness of rejecting that ABA recommendation for multiple reasons, any one of which would be sufficient.

First, Public Charter School does use and rely on ABA, including direct 1:1 ABA therapy for some students for limited periods, but does not view it as desirable as a long-term, full-time therapy.  Public Charter School was trying to teach Student skills for real life and viewed ABA work in the natural environment to be more beneficial by permitting generalization of skills learned, instead of using the ABA discrete trial training approach that Parent appeared to favor through full-time therapy.  At Public Charter School, ABA is one instructional approach used and one of the methodologies incorporated in implementing Student's IEPs.  Public Charter School also uses other methodologies, including TEACCH, which has much overlap with ABA.  Public Charter School considers its more comprehensive approach to teaching methods as preferable to simply relying on ABA. Public Charter School does have staff available to implement ABA as needed, and all Public Charter School staff are trained in ABA.  However, Public Charter School does not – and is

**Hearing Officer Determination**
Case No. 2017-0186

not required to – include ABA or other instructional methodologies on students' IEPs, so as to avoid rigidity and permit flexible IEP implementation by those working with and most knowledgeable about student needs. *See* Department of Education, *Assistance to States for the Education of Children with Disabilities*, 71 Fed. Reg. 46665 (8/14/06) ("[t]here is nothing in the [IDEA] that requires an IEP to include specific instructional methodologies. . . . The Department's longstanding position on including instructional methodologies in a child's IEP is that it is an IEP Team's decision").

Second, Student was making educational progress at Public Charter School even without full-time 1:1 ABA therapy, indicating that it was not necessary. In addition to behavior, Public Charter School worked on functional literacy, functional mathematics and daily living skills with Student in 2016 and made progress on Student's academic goals. Public Charter School's Progress Report for calendar year 2016 showed progress by Student, with mastery of some objectives. Student's behavior also notably improved, as almost all of Student's recorded behaviors other than hitting/attempted hitting had dropped to zero or very close to zero from October 2015 through October 2016. Public Charter School reported great improvement in Student's hitting as well, with a decline to no more than 2 incidents/day from July 2016 through October 2016 (when Student shifted to Nonpublic Institution).

Third, the recommendation for full-time 1:1 ABA therapy did not provide any details about what should be done with the time. School Behavior Analyst asked the Nonpublic Institution evaluator at the FBA review meeting what was to be done during the recommended 30 hours/week and received no response. The usual process would be to determine first what should be done and then ascertain the hours needed to accomplish it. Further, in School Behavior Analyst's expert opinion, a recommendation of service levels should not have been made, as they are beyond the scope of an FBA.

Fourth, the independent evaluation itself had weaknesses that undermined its recommendation, beginning with a lack of content to substantiate its 30 hours/week recommendation for ABA therapy. The witness from Nonpublic Institution (who was not the evaluator) acknowledged that the IEE observations at Public Charter School were short and that multiple observations at Public Charter School would have been desirable; the independent evaluation was based on only one. The independent evaluator relied on a questionnaire about Student's behavior, which School Behavior Analyst credibly testified was not valid or reliable. *See* 34 C.F.R. 300.304(c)(1)(iii). The Nonpublic Institution evaluator also should have interviewed those who knew Student best, but did not attempt to contact School Behavior Analyst, even though she has observed Student many times for a total of more than 50 hours. Further, the Nonpublic Institution evaluator apparently engaged Student's dedicated aide in conversation during the observation at Public Charter School, leading to artificially high data for Student at Public Charter School since Student was not receiving the usual level of support.

Fifth, full-time 1:1 ABA therapy would be a much more restrictive setting than Student needs, in violation of LRE principles. *See* 34 C.F.R. 300.114; *Endrew F.*, 137 S. Ct. at 1000. Full-time 1:1 ABA therapy would not leave time for Student's related services which require 3 hours/week, nor for Specials, nor give Student time in a group setting, but

**Hearing Officer Determination**
Case No. 2017-0186

would isolate Student in a separate location. Student's current IEP and placement at Public Charter School provide an Art Program, Horticulture, Musical Therapy/Education, and Physical Education. Further, Student was not alone at lunch at Public Charter School, but in the cafeteria with Student's dedicated aide and 5-6 children at each lunch table.

Finally, even though Public Charter School did not believe that direct 1:1 ABA therapy was necessary for Student, Public Charter School nonetheless offered to provide some amount of 1:1 ABA therapy for Student with a registered behavior tech overseen by a BCBA, as the independent evaluation recommended. But Parent refused because Public Charter School could not guarantee consistent staff in the same room and couldn't answer questions about the credentials of those who would be providing services to Student. Parent requested a Change in Placement meeting that was conducted at Public Charter School to review Student's placement; the MDT agreed to move forward with an LRE review. Principal asked Parent if Student would attend Public Charter School so the LRE team could observe Student in an educational setting, but Parent made no commitment and Student did not attend. Recognizing that Parent was not satisfied with Public Charter School, another school location was offered to Parent to see if a different school and staff would work better for her. Parent declined to take a tour or consider the alternative location, however, stating that it couldn't be helpful if Student's IEP remained without ABA services, even though Public Charter School never includes ABA services on IEPs even when students do receive 1:1 ABA therapy.

Turning to Petitioner's additional concern about Student not being in a classroom with only autistic children, Public Charter School's philosophy is to not have classrooms with only a single disability and instead focus on keeping skill levels together. Public Charter School intentionally mixes disabilities and avoids all-autism classes to obtain the benefits of peer modeling, as students with certain strengths can help others with different strengths. Thus, Student's class at Public Charter School had several children with autism, others with ID and some classified as MD (with both autism and ID). Student is within the range cognitively: higher than some classmates and lower than others. The children in class who are not autistic provided modeling for Student in the areas of appropriate play in PE and how to walk in the building, among other things.

Appropriate Placement. In determining the appropriateness of Student's educational placement, the standard under the IDEA is that Respondent "must place the student in a setting that is capable of fulfilling the student's IEP." *Johnson v. Dist. of Columbia*, 962 F. Supp. 2d 263, 267 (D.D.C. 2013). *See also O.O. ex rel. Pabo v. Dist. of Columbia*, 573 F. Supp. 2d 41, 53 (D.D.C. 2008) (placement must be in a school that can fulfil the student's IEP requirements). As concluded above, Student was receiving the support needed to make appropriate progress even without direct 1:1 ABA therapy. Public Charter School was a suitable setting for Student to receive that support, where Student had long been placed. The testimony about the classroom and resources available for Student at Public Charter School was entirely reasonable; if anything, there may have been too many resources as Student would have happily spent all day on the available computers and iPads, to the exclusion of more challenging tasks. Here, there is no material failure or "discrepancy between the services a school provides to a disabled child and the services required by that

**Hearing Officer Determination**
Case No. 2017-0186

child's IEP." *N.W. v. Dist. of Columbia*, 2017 WL 2080250, at *7 (D.D.C. May 15, 2017), *quoting James v. Dist. of Columbia*, 194 F. Supp. 3d 131, 139 (D.D.C. 2016).

        In sum, is abundantly clear that Parent has lost confidence in Public Charter School, so the undersigned hopes that there can be some degree of harmony reached between the parties, or else that the parties can work to find an alternative location for Student that will be more satisfactory to Parent.  However, in the current posture, disagreement over ABA methodology and educational philosophy does not amount to a denial of FAPE.  This Hearing Officer concludes that Student's IEPs when developed were reasonably calculated to enable Student to make appropriate progress in light of Student's circumstances and that Public Charter School was a suitable setting in which to implement the IEPs.

        **Issue 3:**  *Whether DCPS denied Student a FAPE by failing to implement Student's IEP with fidelity due to (a) Student's one-on-one full-time aide being "out of area," and (b) failure to manage Student's behavior.  (Petitioner has the burden of persuasion on this issue.)*

        Petitioner failed to meet her burden of proving that Respondent did not adequately implement Student's IEP.  With a failure to implement claim, the IDEA is only violated when a school district deviates materially from a student's IEP.  *See Van Duyn ex rel. Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007).  A material deviation requires more than a minor discrepancy or a "*de minimis* failure to implement all elements of [the student's] IEP."  *Johnson*, 962 F. Supp. 2d at 268, *quoting Catalan v. Dist. of Columbia*, 478 F. Supp. 2d 73, 75 (D.D.C. 2007).  Courts are clear that it is "the proportion of services mandated to those provided that is the crucial measure for purposes of determining whether there has been a material failure to implement."  *Turner v. Dist. of Columbia*, 952 F. Supp. 2d 31, 41 (D.D.C. 2013), *citing Wilson v. Dist. of Columbia*, 770 F. Supp. 2d 270, 275 (D.D.C. 2011).  Notably, there is "no requirement that the child suffer educational harm in order to find a violation" in a failure to implement claim.  *James*, 194 F. Supp. 3d at 139.

        Here, Student's IEPs provided for a full-time dedicated aide, who was with Student all day long at Public Charter School.  Special Education Teacher didn't recall ever seeing Student without a dedicated aide.  There was very little evidence that Student's dedicated aide was "out of area," except when the aide was preparing Student's lunch or taking a break, during which time other coverage was provided.  Documentary reference about Student's dedicated aide being out of area was explained as not meaning out of arm's reach unless another staffer was covering Student.  Petitioner did not demonstrate any failure to implement the dedicated aide requirement, much less a material failure.

        Significant evidence was provided about Student's behavior both at Public Charter School and at Nonpublic Institution, which showed that Student had serious and ongoing behavioral issues, although both sites worked very hard to address Student's behavior.  In response to Petitioner's criticism of Public Charter School for not managing Student's behavior, the undersigned finds relevance in the fact that the data indicated Student was making more progress on targeted behavior at Public Charter School than Nonpublic Institution.  For instance, the Nonpublic Institution goal for aggression was less than 2

**Hearing Officer Determination**
Case No. 2017-0186

incidents/hour (in 8 of 10 sessions), which was not achieved, while Student's aggression level in the last months at Public Charter School was about 2 incidents/day, lower than its goal of 5/day.  Thus, by the time Student left Public Charter School, data showed a decline in rates of problematic behaviors and an increase in participation in activities.  This was corroborated in real life by Health Advocate, who has known Student most of Student's life, and who has seen progress in Student's behavior over time, with hitting decreasing significantly and an increasing ability to sit still.  In short, the undersigned is not persuaded that Public Charter School failed to appropriately manage Student's behavior, for as Nonpublic Institution's experience confirmed, while Student's behavior was very challenging Public Charter School made good progress.  In any case, any such failure by Public Charter School to manage Student's behavior was *de minimis* and not a FAPE violation.

> **Issue 4:**  *Whether DCPS denied Student a FAPE by (a) not allowing Parent input in IEP development, (b) not involving Parent in the placement decision, and/or (c) referring Parent to social services after she sent notifications beginning in or about November 2016 of her unilateral placement of Student at Nonpublic Institution.  (Petitioner has the burden of persuasion on this issue.)*

Petitioner did not meet her burden of demonstrating a denial of FAPE based on her alleged inability to provide input or due to Public Charter School abiding by its attendance policies.  The IDEA requires parental participation and involvement in determining the educational program and placement of their child.  *See* 34 C.F.R. 300.321, 300.322, 300.327, 300.116(a)(1), 300.501(c); *Aikens v. Dist. of Columbia*, 950 F. Supp. 2d 186, 190 (D.D.C. 2013).  Here, Parent had a great deal of input and involvement in discussing with Respondent the results and recommendations of the independent evaluation and was able to repeatedly make her views known directly and through Health Advocate, Petitioner's counsel and an educational advocate.

Parent participated in numerous IEP meetings and has been a great advocate for Student.  For example, after a lengthy MDT meeting in which Parent focused on Student's food/diet, Public Charter School put significant supports in place to accommodate Student's special diet as requested by Parent, purchasing special foods and a freezer to store Student's specific meals based on individualized menus generated by Student's classroom teacher.  Other examples included Public Charter School reducing Student's access to the iPad upon request by Parent, even though that was difficult for Student, and including and repeating a goal on Student's IEPs about using the restroom at school that was important to Parent.  In addition, recognizing that Parent was not satisfied with Public Charter School, another location was developed and offered to Parent to see if that school and staff would work better if she did not want Student at Public Charter School.

While Respondent was not persuaded by the input of Parent and her advocates on every issue, including full-time 1:1 ABA therapy, this Hearing Officer concludes that there clearly was sufficient input by Parent to meet the requirements for parental participation.  *See A.M.*, 933 F. Supp. 2d at 199 (parent had meaningful participation when she actively participated and was supported by a team of experts and advocates).  The fact that Respondent did not change its position or adopt Parent's preferences does not mean that she

**Hearing Officer Determination**
Case No. 2017-0186

did not have adequate input.  *See, e.g., Hawkins v. Dist. of Columbia*, 692 F. Supp. 2d 81, 84 (D.D.C. 2010) (right conferred by the IDEA on parents to participate does not constitute a veto power over the IEP team's decisions); *Schoenbach v. Dist. of Columbia*, 2006 WL 1663426, at *5 (D.D.C. 2006).

As for referring Parent to social services, Parent was not clear with Public Charter School about why Student was absent from Public Charter School and that Student was being served at Nonpublic Institution, resulting in much unnecessary effort by Public Charter School to ensure that Student was safe and receiving an education.  With Student going to Nonpublic Institution for medical treatment, rather than education, it was reasonable and appropriate for Public Charter School to seek a physician's note to excuse Student.  Parent had the 8/31/17 provider's note but inexplicably did not provide it to Public Charter School and the record does not indicate that she ever adequately explained where Student was until after referrals were made to social services, as set forth in detail in the findings above.  In fact, even well into 2017 Parent refused to answer straightforward questions by Public Charter School about where Student was.  Accordingly, this Hearing Officer concludes that there was no denial of FAPE as a result of Public Charter School following its (and DCPS's) attendance policies and exercising due diligence to ensure that Student was safe.

**Issue 5:**  *Whether DCPS denied Student a FAPE by not providing information and refusing to answer questions about Student's programming at Public Charter School, and preventing Parent's educational advocate from observing the proposed program. (Petitioner has the burden of persuasion on this issue.)*

Petitioner failed to meet her burden on this final issue of Public Charter School not providing information and prohibiting an observer.  As an initial matter it is clear that Public Charter School met with Parent repeatedly and communicated frequently by email and tried to answer many questions that Parent posed.  Communication was inherently difficult over the extent to which Public Charter School uses ABA and specifically what forms or type of ABA therapy was intended by the independent evaluation's recommendations, but that was not for lack of trying.  Petitioner did not persuade the undersigned that Public Charter School failed to answer questions about Student's programming, and certainly did not show that Public Charter School denied Student a FAPE as a result of a failure to answer questions.

As for the claim that Parent's educational advocate was not permitted to observe at Public Charter School, the law is clear in the District of Columbia that parents and their designees have a right to observe a student's educational setting, pursuant to the Special Education Student Rights Act.[124]  In this case, Petitioner presented next to no evidence

---

[124] The Special Education Student Rights Act of 2014, D.C. Code § 38-2571.03, provides in relevant part:

about the circumstances of the alleged observation request, relying on the asserted "admission" in Respondent's response that observation is not allowed simply for purposes of litigation.  It is clear to the undersigned that by the time the observation request was made around March 2017, Parent was not seeking additional information about Public Charter School in order to determine if Student should attend.  Parent was very clear that she sought 1:1 ABA therapy for Student at Public Charter School.  Certainly observation of direct 1:1 ABA therapy of a child or children other than Student would not and should not be permitted under the statute.  So direct ABA therapy – Parent's pivotal concern – was not an issue that could be clarified through observation by Parent's educational advocate.

In the absence of evidence from Petitioner concerning the requested observation, this Hearing Officer finds that Petitioner demonstrated no violation of the Special Education Student Rights Act.  But even if there were a violation, the Act does not contain a remedy.

---

(5) (A) Upon request, an LEA shall provide timely access, either together or separately, to the following for observing a child's current or proposed special educational program:

(i) The parent of a child with a disability; or

(ii) A designee appointed by the parent of a child with a disability who has professional expertise in the area of special education being observed or is necessary to facilitate an observation for a parent with a disability or to provide language translation assistance to a parent; provided, that the designee is neither representing the parent's child in litigation related to the provision of free and appropriate public education for that child nor has a financial interest in the outcome of such litigation.

(B) The time allowed for a parent, or the parent's designee, to observe the child's program shall be of sufficient duration to enable the parent or designee to evaluate a child's performance in a current program or the ability of a proposed program to support the child.

(C) A parent, or the parent's designee, shall be allowed to view the child's instruction in the setting where it ordinarily occurs or the setting where the child's instruction will occur if the child attends the proposed program.

(D) The LEA shall not impose any conditions or restrictions on such observations except those necessary to:

(i) Ensure the safety of the children in a program;

(ii) Protect other children in the program from disclosure by an observer of confidential and personally identifiable information in the event such information is obtained in the course of an observation by a parent or a designee; or

(iii) Avoid any potential disruption arising from multiple observations occurring in a classroom simultaneously.

(E) An observer shall not disclose nor use any information obtained during the course of an observation for the purpose of seeking or engaging clients in litigation against the District or the LEA.

Hearing Officer Determination
Case No. 2017-0186

Viewing the Act as a clarifying regulation,[125] this Hearing Officer determines that not being able to observe Public Charter School was at most a procedural violation, which did not impede Parent's opportunity to participate in decision-making relating to Student's education in the circumstances of this case. With Student having attended Public Charter School for many years, Parent did not need a representative to observe Public Charter School to know that she was not returning her child there. Parent's dispositive concern was lack of ABA, about which no observation was needed or helpful. Thus, any denial of observation was not a substantive violation or a denial of FAPE pursuant to 34 C.F.R. 300.513(a)(2)(ii). *See McLean v. Dist. of Columbia*, 2017 WL 3891669, at *3 (D.D.C. Sept. 5, 2017).

## ORDER

Petitioner has not prevailed on any of the issues in this case. Accordingly, **it is hereby ordered** that any and all claims and requests for relief are **dismissed with prejudice**.

**IT IS SO ORDERED.**

Dated in Caption                    /s/ *Keith Seat*

                                    Keith L. Seat, Esq.
                                    Hearing Officer

## NOTICE OF RIGHT TO APPEAL

This is the final administrative decision in this matter. Any party aggrieved by this Hearing Officer Determination may bring a civil action in any state court of competent jurisdiction or in a District Court of the United States without regard to the amount in controversy within ninety (90) days from the date of the Hearing Officer Determination in accordance with 20 U.S.C. § 1415(i).

Copies to:

Counsel of Record (Appendix A, by email)
OSSE-SPED (due.process@dc.gov)
ODR (hearing.office@dc.gov)
Contact.resolution@dc.gov

---

[125] The right of observation by parent or designee in the Special Education Student Rights Act may be viewed as tantamount to a regulation clarifying part of what is required to provide a parent the right to participate meaningfully in determining a student's IEP or placement. *See Cano-Angeles v. Puerto Rico (Dept. of Educ.)*, 2015 WL 6133130, at *4 (D.P.R. Oct. 14, 2015) ("hearing officers [are to] consider both state and federal law to ensure that the [IDEA] is properly being implemented").

**Hearing Officer Determination**
Case No. 2017-0186

## APPENDIX A

*Sacari Coates v. DCPS*
Case No. 2017-0186

| *PUBLIC TERM IN HOD* | *PERSONALLY IDENTIFIABLE INFORMATION* |
|---|---|
| Student | ███████ |
| Date of Birth, Age, Gender | ██████████████ |
| Student ID Numbers | ████████████████ |
| | ████████ |
| Grade | █ ███████ |
| | |
| Public Charter School | St. Coletta of Greater Washington (2006/07 to early 2016/17) |
| Nonpublic Institution | Center for Autism & Related Disorders (CARD) (2016/17, 2017/18) |
| | |
| Petitioner/Parent | Ms. Shonta Jones |
| Petitioner's counsel | Laura George, Esq. |
| LEA Representative | Ms. Christie Mandeville |
| Respondent's counsel | Maya Washington, Esq. |
| | |
| | *PETITIONER'S WITNESSES* |
| Parent | Ms. Shonta Jones |
| Health Advocate | Ms. Doreen Blue-Hodges |
| Private Behavior Analyst (qualified without objection as an expert in Assessing, Treating, and Developing Behavior Plans for Children with Autism, and Applied Behavior Analysis) | Ms. Renat Matalon |
| | |
| | *RESPONDENT'S WITNESSES* |
| Special Education Teacher at Public Charter School | Ms. Katherine Brown |
| School Behavior Analyst (qualified without objection as an expert in Applied Behavior Analysis and Programming for Special Education Students) | Ms. Ester Pline |
| Principal at Public Charter School (qualified over objection as an expert in Special Education and IEP Programming for Students with Autism) | Ms. Christie Mandeville |